**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

19 - 618

| | |
|---|---|
| LAURA WILLIS LUHN, An individual<br>Los Angeles, CA<br><br>                         Plaintiff,<br>         v.<br><br>SHOWTIME NETWORKS, INC., A Delaware<br>Corporation<br>Registered Agent Listed As:<br>Corporation Service Company<br>251 Little Falls Drive<br>Wilmington, DE 19808<br><br>and<br><br>BLUMHOUSE PRODUCTIONS, LLC, A<br>Delaware Limited Liability Company<br>Registered Agent Listed As:<br>Corporation Service Company<br>251 Little Falls Drive<br>Wilmington, DE 19808<br><br>and<br><br>GABRIEL SHERMAN, An individual<br>3537 78th St. #41<br>Jackson Heights, NY 11372<br><br>                         Defendants. | **CIVIL ACTION COMPLAINT**<br>**FOR VIOLATIONS OF THE**<br>**LANHAM ACT AND OTHER**<br>**CAUSES OF ACTION**<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED COMPLAINT FOR VIOLATIONS OF THE LANHAM ACT AND OTHER CAUSES OF ACTION

### I.     INTRODUCTION

Plaintiff Laura Willis Luhn, former Senior Director of Corporate and Special Events, former Director of Booking and Associate Producer for Fox News, ("Plaintiff" or "Plaintiff Luhn"), by counsel, sues Defendants Showtime Networks, Inc. ("Showtime"), Blumhouse Productions, LLC dba Blumhouse Television ("Blumhouse"), and Gabriel Sherman ("Sherman") acting at all material times in concert, jointly and severally, in this civil action for violations of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, negligence, and unjust enrichment as a result of

1

Defendants, each and every one of them, causing actual damages, compensatory damages, and giving rise to punitive, treble damages and an award of attorneys fees, including continuing and aggravated harm to Plaintiff's professional, business and personal reputation and livelihood. As grounds therefore, Plaintiff alleges as follows:

## II.    JURISDICTION AND VENUE

1.     This is an action for violations of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, negligence and unjust enrichment.

2.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 (federal question) in that this is a dispute that arises under the federal Lanham Act, 15 U.S.C. §§ 1051 *et seq*. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) for Plaintiff's additional claims.

3.     This Court has personal jurisdiction over Defendant Showtime because Showtime is a corporation organized under the laws of Delaware and therefore is subject to this Court's personal jurisdiction because it resides in this judicial district and a large portion of the allegd acts arose in this district.

4.     This Court also has personal jurisdiction over Defendant Showtime because it has maintained continuous and systematic contacts with the State of Delaware, including but not limited to, purposefully availing itself to this forum by, among other things, making, marketing, shipping, using, offering to sell or selling, or causing others to use, offer to sell, or sell products and services in the State of Delaware, and deriving substantial revenue from such activities.

5.     This Court has personal jurisdiction over Defendant Blumhouse because Blumhouse is a limited liability company organized under the laws of Delaware and therefore is

subject to this Court's personal jurisdiction because it resides in this judicial district and a large portion of the acts alleged herein arose in this district.

6.     This Court also has personal jurisdiction over Defendant Blumhouse because it has maintained continuous and systematic contacts with the State of Delaware, including but not limited to, purposefully availing itself to this forum by, among other things, making, marketing, shipping, using, offering to sell or selling, or causing others to use, offer to sell, or sell products and services in the State of Delaware, and deriving substantial revenue from such activities.

7.     This Court has personal jurisdiction over Defendant Sherman because he has maintained continuous and systematic contacts with the State of Delaware, including but not limited to, purposefully availing himself to this forum by, among other things, making, marketing, shipping, using, offering to sell or selling, or causing others to use, offer to sell, or sell products and services in the State of Delaware, including his *New York Times* Bestselling Book "The Loudest Voice in the Room", and deriving substantial revenue from such activities.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3) and 28 U.S.C. § 1391(c)(2) because Defendants are subject to the Court's personal jurisdiction with respect to this action.

III.   **PARTIES**

9.     Plaintiff Luhn is an individual, natural person who is a citizen of the State of California, County of Los Angeles. Plaintiff is not a public figure.

10.    Defendant Showtime is a cable and satellite television network corporation incorporated under the laws of the State of Delaware. Defendant Showtime has purposefully availed itself to this Court.

11.     Defendant Blumhouse is a film and television production company incorporated under the laws of the State of Delaware. Defendant Blumhouse has purposefully availed itself to this Court.

12.     Defendant Sherman is an individual, natural person who is a citizen of the State of New York. Defendant Sherman has purposefully availed himself to this Court.

## IV.   STANDING

13.     Plaintiff Luhn has standing to bring this action because she has been directly and actually affected and victimized by the unlawful conduct complained herein. Her injuries are proximately related to the misconduct of Defendants, each and every one of them, jointly and severally.

## V.   FACTS

14.     Defendant Showtime and Defendant Blumhouse and Defendant Sherman, acting in concert, jointly and severally, are currently filming and will be airing an eight-episode miniseries about the former Chief Operating Officer ("CEO") of Fox News Channel ("Fox News") and CEO Fox Business Network ("FBN"), Roger Ailes ("Ailes"), who was accused of decades of sexual harassment and other illegalities before resigning in disgrace in 2016 and dying a year later.

15.     Plaintiff Luhn is an integral part of the eight-episode miniseries.

16.     Plaintiff was a part of the original staff which launched the Fox News Channel.

17.     Plaintiff met Ailes in the summer of 1988 at the Washington, D.C. headquarters of the George H.W. Bush presidential campaign while she was on the staff at the campaign.

18.     Plaintiff spent almost 15 years working for Fox News beginning on August 12, 1996 as a Guest Relations staffer for *Fox News Sunday with Tony Snow*. Plaintiff was part of the

original staff that launched the Fox News Channel and was based in the Washington Bureau. Later, Plaintiff was promoted to Associate Producer/Guest Producer and was part of the *Special Report with Brit Hume* staff during the Kenneth Starr investigation and former president Bill Clinton impeachment proceedings. Plaintiff later became the Director of Booking for the Fox News Channel that included managing staff in both Washington, D.C. and New York City. In 2007, Plaintiff was promoted to Senior Director of Corporate and Special Events. This new position required commuting weekly to New York City working on the VIP launch event for the Fox Business Network hosted by Executive Chairman of News Corp, Rupert Murdoch, held in October at the Metropolitan Museum of Art in New York City.

## Facts Pertaining to Sexual and Psychological Abuse by Roger Ailes and Fox News

19.     During the entirety of Plaintiff's time on staff at Fox News, Ailes demanded, coerced, extorted, blackmailed and forced sexual favors from her, making impossible, frightening, dangerous and unrealistic demands and using abusive mind control techniques that he referred to as her "training." Ailes had bragged that he conducted training at the Central Intelligence Agency ("CIA") and this was his way to keep "Plaintiff in line and loyal to him." He would periodically call her in Washington telling her he felt her slipping up and that she needed more "training."

20.     The immensely powerful Ailes always reinforced to Plaintiff that she was to tell no one about what she considered his abusive and threatening tactics and demands, which is why she remained very fearful of Ailes' promised retribution during her tenure with Fox News. Ailes told her to think of it as the military and that she was expected to follow orders. The "orders" were implied in every aspect of the Plaintiff's work life and personal life. Ailes required Plaintiff "to report in" anything she had heard or seen that he would find "useful."

21. Plaintiff was told to follow orders like "G.I. Jane" and act like Doris Day.

22. Plaintiff was forced to purchase black garters and stockings to wear for Ailes, which he called her "uniform." He required her to leave her job in the middle of the day and meet him in various hotel rooms requiring her to wear the "uniform." This was particularly painful, humiliating, and embarrassing to Plaintiff, as she was booking guests for a show and had to excuse herself, falsely telling the producers she felt ill. Ailes constantly reminded Plaintiff, "I own you."

23. When Plaintiff received a promotion in June of 2004, Ailes told her she needed to "thank him" as a *quid pro quo*. While in his office at Fox News Headquarters ("HQ"), Ailes told Plaintiff to go to the Doubletree Hotel in Times Square, put on her "uniform" and thank him for the promotion. Ailes forced Plaintiff to meet him at the hotel and perform oral sex in order to thank him for the promotion, continuing to manipulate Plaintiff. As the promotion was explained to Plaintiff, she would no longer report to Kim Hume, the Washington DC Bureau Chief. Ailes told her that she would be reporting to New York – specifically to Bill Shine. That actually included anyone from management on the second floor of the Fox News Headquarters ("HQ"), usually Suzanne Scott, but also Kevin Magee, Irene Briganti, Judy Laterza and others.

24. A telephone call or email from anyone in Ailes' inner circle came with the understanding that it was what Ailes wanted, implying "following orders" no matter the consequence. It was absolutely understood that you were never to question orders. This created an atmosphere of mistrust toward Plaintiff, especially while try to function in her new role as Manager of Booking, operating in a hostile environment in the Washington D.C. Bureau.

25. Instead of using the Fox Travel Department, Ailes required Plaintiff to make her own hotel arrangements. Ailes was adamant that Plaintiff not stay at the Muse Hotel, where most

6

of the Fox staff stayed. Plaintiff was expected to contact directly the Doubletree at Times Square, the Renaissance Hotel Times Square or the Omni Berkshire. Ailes ordered that Plaintiff stay at hotels that he had concluded were "safe" and convenient for him. This caused further embarrassment and humiliation for Plaintiff with questions raised concerning her hotel arrangements

26.     However "safe" Ailes had concluded the Doubletree was for him, Plaintiff was informed by a co-worker, Jama Vitale, in November 2006, almost 2 ½ years after the June 2004 promotion, that Peter Zorich, nephew to Michael Dukakis and a producer in the New York bureau, had witnessed Ailes leave the hotel and a few minutes later, had seen Plaintiff depart.

27.     Plaintiff was unaware of Zorich, but had run into Cal Thomas, a Fox News Contributor while departing to take a cab to the airport. Ailes later told Plaintiff that he had visited with Cal Thomas in the hotel lobby when departing.

28.     It is noteworthy that by October 2004, Ailes was embroiled in a sexual harassment lawsuit filed by Fox News Channel producer Andrea Mackris against Bill O'Reilly. After settling, the Andrea Mackris situation had terrified Ailes and his inner circle just enough to preempt any perceived threat or future litigation from Plaintiff Luhn.

29.     It was as if the entire Ailes inner circle employed tactics to "discredit" Plaintiff right after the Mackris fallout. This created an impossible work environment for Plaintiff, whom they had set up to fail.

30.     This pattern of conduct by Ailes fueled harmful gossip in New York and Washington D.C., further alienating Plaintiff Luhn from her co-workers and the management of Fox News. Ailes' threatening brazenness and arrogance escalated as the years went on, and the demands became more frightening. Ailes manipulated and threatened Plaintiff, reminding her

that he kept the compromising photographs and videos that he had taken of her in a safe-deposit box and that they were his "insurance policy" so that she would remain both silent and loyal to him. Blackmailed, and with no realistic options to get away from his predatory and threatening behavior, Plaintiff felt boxed in with no choice but to comply when he ordered her to meet him in a hotel room. The abusive and intense mind control techniques were most effective and she had no choice but to trust the man who told her that he was her only friend. Plaintiff was required to consistently pledge her loyalty to Roger Ailes, playing on the Plaintiff's extremely vulnerable position.

31.     While this abusive behavior continued, Ailes continued to also play the role of "mentor" to Plaintiff, which was confusing to Plaintiff and meant to keep her off balance. Yet, she was expected to follow his orders, no matter how outrageous.

32.     There was a period of time after the terror attacks on September 11, 2001 when Ailes told Plaintiff Luhn that he had a "friend" he wanted her to meet. The "friend" was a woman he had brought to a suite at the Renaissance Hotel in Times Square. Plaintiff was asked to perform 3-way sex with Ailes and his "friend." Plaintiff recalls Ailes being threatening and forceful. She was terrified and remains traumatized to this day from the experience. There were at least three other meetings in New York hotel rooms with his "friend." The last meeting that Plaintiff recalls took place at the Omni Berkshire Hotel in New York in October 2005. Plaintiff recalls Ailes with a camera on that day. She will never forget the trauma and sickness she felt when she saw him photograph her with that woman. Ailes often reminded the Plaintiff of his "loyalty requirement" and of his collection of compromising photographs of the emotionally shattered Luhn that he "owned." Ailes kept screaming to Plaintiff, "get in there Laurie!" and violently shoving her into his "friend."

33.     Ailes photographed, coerced, blackmailed, extorted and threatened Plaintiff in Mafioso fashion for twenty years. He disseminated false statements and smears to both the management, on-air talent and staff of Fox News, defaming Plaintiff. Ailes used character assassination to damage Plaintiff's reputation and intentionally gave false statements about Plaintiff to the media in an effort to create confusion and deflect from his two decades long sexual harassment and abuse of Plaintiff. Ailes monitored, harassed and gaslit Plaintiff Luhn, and along with his aides, drove her into a deeply depressed mental state causing severe mental anguish and emotional distress.

34.     Ailes hired contractors (which were overseen by one of the Vice Presidents of Fox News, Warren Vandeveer to install a very large unusual brass lock that could be accessed by a fingerprint and a separate key to Plaintiff's front door at her Westchester apartment in Washington, D.C., located at 4000 Cathedral Avenue, NW, Apartment 729B. Curious neighbors questioned Plaintiff about the lock. It was obtrusive and unlike the standard building locks for the Westchester. It was another embarrassing and humiliating experience for the Plaintiff to endure. Ailes was completely oblivious to Plaintiff's continuing pain, humiliation and trauma. Ailes told her falsely that it was for her security and protection. However, Plaintiff's apartment continued to be ransacked regularly.

35.     At one point during her tenure at Fox News, Ailes told Plaintiff to cut off contact with both staff in the Fox News Washington, D.C. bureau and her personal friends, ordered her to sell her co-op apartment in Washington, D.C. and move to New York in order for him to monitor her and control and use her. Plaintiff was a classic victim of Stockholm Syndrome. This was part of a diagnosis by Plaintiff's psychiatrist, and one that she has continued to suffer as a result of years of abuse and conflicting messages from Ailes.

9

36.    Ailes would call Plaintiff at her desk in Washington and demand phone sex.

37.    Ailes continuously told Plaintiff that she had "no friends" and that he was her only friend in the world. "I'll protect you," Ailes told Plaintiff. "You need to do this for me, stay quiet and show your loyalty, Laurie." Ailes continued to threaten Plaintiff by telling her not to trust anyone with the exception of Ailes' inner circle at Fox News, which included Judy Laterza, Michael Tammero, Bill Shine, and Suzanne Scott, now the Chief Operating Officer at Fox News.

38.    Ailes had installed Plaintiff in the Washington Bureau of Fox News in 1996, telling her that she would be his "eyes and ears in Washington." Ailes required Plaintiff to report to him any signs of what he called "disloyalty" within the management, staff, and on-air talent of Fox News, and that included anyone who did not fall in line with Ailes' editorial agenda. This later included on-air guests that Ailes deemed unsuitable because of their particular views on policy, whatever may be the topic at hand or his whim. Ailes was an extremely vindictive and mean person towards guests who "displeased" him for any reason. It was an unwritten policy that got so out of hand, Plaintiff lost her job as Director of Booking due to an impending expose by Brody Mullins of *The Wall Street Journal* and what became not so fondly known as Ailes' "blacklisting" of guests appearing on Fox News. It was a huge controversy at the time. *The Wall Street Journal* did not run the piece because Plaintiff was removed from the news division and was considered no longer "relevant," according to Ailes.

39.    Media Relations Vice President Irena Briganti told Plaintiff that she would need to be removed from the Booking Unit because of the rumors and gossip surrounding the Plaintiff and Ailes. The Media Relations Department and the very volatile and paranoid Ailes were making every effort to stop *The Wall Street Journal* from publishing this expose on Fox News

"blacklisting" because it would no doubt put the entire operation and Ailes' culture under close scrutiny for their disreputable editorial approach and the highly abusive Ailes/Luhn relationship. Here, it was actually Briganti, not her supervisor Bill Shine, who effectively removed Plaintiff from her position as Director of Booking in a preemptive move to (always) protect her boss (Ailes) from scrutiny and negative press or exposure, no matter the collateral damage, the lies that were told, the extent of the cover-up, or the lives that were destroyed. As part of a larger strategy and reflective of the "culture" of Fox News, Ailes tasked the Media Relations Department with the role of smearing and discrediting Plaintiff. This provided Ailes "cover" and plausible deniability since he could not be held responsible for "whispers to the media."

40.    The removal of Plaintiff from the news division was severely traumatic as it was actually a cover-up for Ailes' crimes perpetrated against her. With his tremendous power and influence, Ailes was able to shift the focus and kill the Wall Street Journal piece in an effort to deflect from his sexual abuse. Ailes had always used Fox News programming and editorial content to impose his own political views and biases; settling scores with enemies, real or perceived. Ailes installed Fox News Contributors agreeable to those views that he deemed "loyal" and paid them handsomely. He skillfully shielded himself from many of the attacks. He depended on his inner circle of loyal lieutenants, including some of the on-air talent and contributors as layers of protection from negative press. He seemed to treat character assassination like a game, one that he was well-skilled at and quite enjoyed. He even employed his personal attorney, Peter Johnson, Jr. as a Fox News Contributor.

41.    Plaintiff had been referred to as "Roger's spy" since the early days of Fox News, both within the organization and in the greater political and journalistic community. Plaintiff suffered greatly by this designation and the continuing gossip and innuendo that permanently

damaged the Plaintiff's reputation – never to be recovered – as she has endured unimaginable pain and sadness, while at the same time being defamed, including loss of family relationships.

42.     Ailes also utilized Fox News' Management and Media Relations Department to monitor, harass, threaten, and gaslight Plaintiff. Ailes made a management decision to destroy both Plaintiff's confidence and reputation in an effort to completely "discredit" her as a future witness against Ailes' illegal acts and sexual abuse.

43.     For twenty years, Ailes threatened Plaintiff by telling her, "I own you."

44.     Starting in 2006 and into 2007, Plaintiff had a stalker. Ailes fueled her fear and  kept her terrified by telling her she should not stay in her Washington D.C. co-op apartment that she owned. Ailes had her stay at the Warwick Hotel in New York under the name Suzanne Scott, who is today the CEO of Fox News. It was a frightening and harrowing experience where Ailes required Plaintiff to cut off all communication with everyone, even old, personal friends. Ailes forced Plaintiff to provide all incoming and outgoing emails to him for "approval." He even dictated responses for the Plaintiff to send. It was classic Ailes - making the Plaintiff feel owned, controlled and completely dependent on him. Plaintiff was fearful because the stalker had been ransacking her Washington D.C. apartment on a regular basis. Ailes told the Plaintiff that George Soros and Hillary Clinton were trying to kill her.

45.     Ailes had constantly demanded what he referred to as "loyalty" and forbade Plaintiff from telling her Washington D.C. psychiatrist – Dr. David Fischer - friends or family about the constant sexual, emotional and psychological abuse. She remained silent for 20 years, becoming deeply depressed by keeping the destructive abuse she endured bottled up inside, resulting in humiliation and embarrassment. The traumatized Plaintiff was completely isolated from Fox News staff and remained a prime target for painful malicious gossip and rumors,

eventually driving her from Washington D.C. and moving to Los Angeles in 2011. Ailes exploited the Plaintiff's vulnerable position and dependency on him – intentionally keeping her off balance through his destructive mind control techniques, Mafioso tactics, gaslighting and harassment by his aides, causing severe psychological damage.

46.     Ailes threatened, harassed and questioned Plaintiff about every aspect of her life. This included probing her personal life and constantly instructing her on whom she could "trust," whom she could have as friends, including forcing her to cut off existing relationships with friends and colleagues. Ailes was very insistent for years that the Plaintiff could not trust anyone. Therefore, this resulted in complete isolation both from within Fox News and the community as a whole. Roger Ailes was guilty of a decades-long obsession with Plaintiff Luhn. This obsession was sadistic and proved dangerous and highly toxic to the Plaintiff.

47.     In 2011, Bill Shine, Ailes' right-hand man – at the direction of Ailes – ordered Plaintiff to vacate her apartment – with zero notice – in Los Angeles. This event took place a few days after *The New York Times* published a page one story on February 24, 2011 about Roger Ailes urging Judith Regan to lie to federal investigators regarding a cover-up involving key figures, such as Bernard Kerik of the 9/11 terror attacks.

48.     Shine hired Pinkerton Security and sent Plaintiff to her family home in San Antonio, telling her that the Los Angeles ("LA") apartment had to be checked out due to stalkers. Ailes had continued to tell the Plaintiff that George Soros was trying to kill her, which kept her terrified because she was being terrorized at the LA apartment. During her stay with her parents, Bill Shine, Ailes' top deputy, sent Plaintiff to a handpicked psychiatrist based at the University of Texas Health Science Center in an effort to manipulate and prevent her from speaking out about the sexual and psychological abuse.

49.     While in San Antonio, Plaintiff contacted the office of the Attorney General of the United States, Eric Holder, on the telephone. It is noteworthy that there were rumors online and in the press that Roger Ailes was to be indicted, which terrified the Plaintiff because she was tied to him. Plaintiff explained that she would like to have a confidential conversation with Holder regarding Fox News. Mr. Holder's assistant would not put the call through to the Attorney General. Instead, Plaintiff was directed to meet with First Assistant U.S. Attorney Jim Blankenship ("Blankenship") in San Antonio. A very shaken and frightened Plaintiff spent time outlining in graphic detail the years of abuse and psychosexual torture that she endured at the hands of Ailes.

50.     Blankenship, a George H.W. Bush appointee, and his aide, were dismissive and did not take her seriously or make any effort to follow up on the very serious claims regarding Ailes. The meeting was cut short when the Shine-picked psychiatrist, Dr. Camis Milam ("Dr. Milam"), called her out of the meeting while she was in the U.S. Attorney's office in San Antonio. On the telephone, Dr. Milam threatened to admit the Plaintiff to the hospital psych ward that very night if she did not leave immediately.

51.     In fact, the doctor admitted Plaintiff to the psychiatric ward at a mental hospital 48 hours later. Dr. Milam scolded the Plaintiff for contacting the U.S. Department of Justice. Both Bill Shine and Dianne Brandi, Legal Counsel for Fox News, were in direct and constant contact with Dr. Milam – including issuing threats to the Plaintiff and scolding her for contacting a co-worker at Fox News.

52.     This was part of Ailes' strategy to paint Plaintiff as "crazy, delusional, and paranoid" and to discredit any possible testimony regarding his psychological and sexual abuse. As acts of intimidation, Bill Shine also frequently called Plaintiff's father during this time asking

14

questions about her.

53.    When Plaintiff returned to her LA apartment, Dr. Milam indirectly referred Plaintiff to an attorney in order to negotiate settlement with Fox News.

54.    However, Fox News executives knew that Plaintiff was in no mental or emotional condition to negotiate settlement, as she was on serious medication that prevented her from having a clear head or thinking logically. Plaintiff was traumatized and frightened of a media spectacle if she filed suit against Fox News.

55.    Plaintiff never received proper assistance of counsel, as she was pressured and deceived, if not fraudulently induced, into settlement by the unethically conflicted attorney who was referred indirectly by Dr. Milam – who was working in concert with Fox News – when Plaintiff really needed to file a legal action. No legal action was ever filed, and Plaintiff, in a heavily medicated, hazy, and foggy mental state, was pressured, coerced and fraudulently induced into agreeing to settlement.

56.    The entire "settlement" process was rushed through and slapped together extremely quickly by Ailes, Dianne Brandi, and Plaintiff's attorney, all working closely together.

57.    Plaintiff has suffered and continues to suffer serious, debilitating and life threatening trauma, anxiety and other serious health complications as a result of Ailes' severe psychological torture and mind control. This was covered up and furthered by his inner circle, including but not limited to Judy Laterza, Bill Shine, Brian Lewis, Irena Briganti and Suzanne Scott. Emotionally shattered and deeply depressed by her tragic experience with Ailes and Fox News and a with destroyed reputation, Plaintiff twice attempted suicide and to this day continues to be severely damaged with PTSD and bouts of intermittent anxiety and hopelessness. She continues to feel isolated and ostracized by society. The long-term impact and severe damage

caused by Ailes' mind control techniques, and the cover-up and complicity of his abovementioned top aides, and the resulting Stockholm Syndrome still gripping and strangling the Plaintiff is incalculable. Plaintiff has never been able to reach closure through this ongoing painful process of defamation, a tragedy resulting in loss of income and any chance of a healthy existence.

58.    After Ailes resigned in 2016, Plaintiff called a New York law firm hired by 21st Century Fox to investigate sexual-harassment allegations against him.

59.    Ailes sexually, psychologically and emotionally harassed Plaintiff for over two decades.

### Facts Pertaining to *The Loudest Voice in the Room*

60.    Defendant Showtime, by and through Defendant Blumhouse and Defendant Sherman, acting in concert, jointly and severally, is currently filming *The Loudest Voice in the Room* and will soon air the eight-episode miniseries about Roger Ailes.

61.    Defendant Showtime's and Defendant Blumhouse's miniseries is based on the book and prior writings of Defendant Sherman and stars Russell Crowe as Ailes, Naomi Watts as Gretchen Carlson, the first prominent person to publicly accuse Ailes of sexual harassment, and has cast A-list actress Annabelle Wallis as Plaintiff Luhn.

62.    Defendant Sherman coerced and induced Plaintiff to be interviewed, telling her through an intermediary, Madelon Highsmith, that she was in "danger" and thus shamelessly and cruelly lured her to be interviewed by Defendant Sherman as so-called "protection." When Plaintiff expressed hesitation about going forward with the interview, Defendant Sherman told Plaintiff that he had heard from a NewsCorp executive that her June 15, 2011 Separation Agreement: "was not worth the paper it was printed on." Defendant Sherman, to induce her to be

interviewed, further stated that he knew of instances where the Agreement by Fox News had been broken and that the Plaintiff had been disparaged by Fox News – in violation of the Separation Agreement and Mutual General Releases signed by Ailes and Shine.

63.     Defendant Sherman recorded the interview with over 11 hours of audio including accessing the Plaintiff's computer with Defendant Sherman's wife, Jennifer Stahl of the *New Yorker*, who unexpectedly accompanied Defendant Sherman for the interview – which took place at the Plaintiff's residence in Encino, California. Defendant Sherman published lies, promoted, marketed and monetized Plaintiff's severe pain, trauma and tragedy. He capitalized on her very vulnerable state of mind, PTSD and exploited an already terrified, confused, and emotionally shattered woman. Defendant Sherman cashed in on Plaintiff's tragic Fox News experience and the psychosexual torture she endured by Ailes without so much as a courtesy notification regarding the Showtime and Blumhouse series, damaging Plaintiff's reputation.

64.     Prior to this, Defendant Sherman published an article on July 29, 2016, titled *"Former Fox News Booker Says She Was Sexually Harassed and 'Psychologically Tortured' by Roger Ailes for More Than 20 Years"*, which contains several false, misleading and defamatory statements and innuendos. When Plaintiff demanded that the misleading and false statements be retracted and/or corrected, Defendant Sherman ignored her requests and proceeded on to profit from his works which used, however inaccurately, the likeness and being and life story of Plaintiff.

65.     Defendants Showtime, Blumhouse and Sherman use Plaintiff's identity, name, likeness, persona, privacy rights and otherwise ("Plaintiff's Rights") to advertise, market, sell, and promote and sell Defendants' miniseries, commercial products, and commercial services.

66.     In addition to using Plaintiff's Rights, Defendants, on information and belief, use Defendant Sherman's false, misleading and defamatory statements and innuendos and present them as facts in their miniseries. In particular, Defendant Sherman falsely claimed that Plaintiff Luhn sent Ailes women to his office "after hours" as well as falsely representing that she had a history of mental illness, among other perversions of the truth.

67.     As just one example, Defendant Sherman falsely claimed that Plaintiff fired a staffer, when in reality Human Resources fired that staffer for cause. The article was neither fact-checked as promised nor corrected.

68.     At no time did Plaintiff ever give permission to Defendants, any of them, to use Plaintiff's Rights or otherwise to associate with, advertise, market, promote and sell Defendants' miniseries, commercial products, or for any other purpose. Nor did she give Defendant Sherman in particular the right to use her likeness and being to produce a manuscript and script of her life story to sell to the other Defendants to line his own pockets. The eight-episode miniseries prominently features this life story and a prominent A-list actress has been cast to play the prominent role and part of Plaintiff Luhn.

69.     Plaintiff has not received any compensation for such unauthorized commercial use of Plaintiff's Rights and otherwise to advertise, promote, market and sell Defendants' miniseries, products, and services.

70.     Plaintiff is informed and believes that Defendants intentionally, purposefully, recklessly, and/or negligently used Plaintiff's Rights to advertise, promote market and sell Defendant's miniseries, products and services.

71.     Defendants have, without any right, title or authorization, misappropriated Plaintiff's Rights for their own commercial purposes and resulting financial reward.

72.     Plaintiff and her undersigned counsel have tried to resolve the serious matters set forth in this Verified Complaint but Defendants, each and every one of them, have refused, obviously believing that their self-styled powerful standing in Hollywood, the entertainment industry and elsewhere and far superior financial positions would dissuade Plaintiff from filing this lawsuit. As a result, Defendants' law firm, Davis Wright Tremaine initially brushed Plaintiff aside, to allow their clients to continue to exploit and profit from Plaintiff Luhn's tragic and abusive past with Ailes and Fox News, which is prominently portrayed in their works by and through A-list actress Annabelle Wallis, who was cast to play Plaintiff.

## VI.     CAUSES OF ACTION

**COUNT ONE**
**Federal Unfair Competition**
*Lanham Act § 43(a), 15 U.S.C. § 1125(a)(1)(A)*
**(Against All Defendants)**

73.     Plaintiff repeats, re-alleges, adopts and incorporates all of the previous allegations of the entirety of this Verified Complaint, with the same force and effect, as if fully set forth herein again at length.

74.     Defendants' distribution of the miniseries, including but not limited to its promotions, advertisements, sales and commercial activities, all of which use Plaintiff's Rights, is likely to cause confusion, mistake or deception as to the source or affiliation of Defendants' goods and services and otherwise related to her life story.

75.     Defendants' unauthorized use of Plaintiff's Rights falsely indicates that Plaintiff Luhn or her agents are connected with, sponsored, endorsed, authorized, or approved by, or affiliated with Defendants, or that Defendants are connected with, sponsored, endorsed, authorized, or approved by, or affiliated with Plaintiff's Rights.

76.     Defendants unauthorized use of Plaintiff's Rights in connection with their miniseries allows Defendants to receive the benefit of Plaintiff's goodwill, which she has established at great labor and expense professionally as one of the original Fox News Channel staffers, and her public appearances, and further allows Defendants to gain acceptance of Plaintiff's Rights based not on the miniseries, but on the reputation, hard work and goodwill of Plaintiff.

77.     Defendants have unfairly profited from their false and/or misleading representations.

78.     Plaintiff has been damaged by Defendants' false and/or misleading representations.

79.     Defendants' acts are wilful and Plaintiff is entitled to treble damages.

80.     The unlawful acts of Defendants complained herein constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

**COUNT TWO**
**Federal False Designation of Origin**
*Lanham Act § 43(a), 15 U.S.C. § 1125(a)(1)(B)*
**(Against All Defendants)**

81.     Plaintiff repeats, re-alleges, adopts and incorporates all of the previous allegations of the entirety of this Verified Complaint, with the same force and effect, as if fully set forth herein again at length.

82.     Defendants' distribution of the miniseries, including but not limited to its promotions, advertisements, sales and commercial activities, all of which use Plaintiff's Rights, misrepresents the nature, characteristics, qualities, and/or geographic origin of Plaintiff's Rights, including her goods, services, and/or commercial and other activities.

83.     Defendants' unauthorized use of Plaintiff's Rights and nature, characteristics, qualities and/or geographic origin in connection with their miniseries allows Defendants to receive the benefit of Plaintiff's goodwill, which she has established at great labor and expense professionally as one of the original Fox News Channel staffers, and further allows Defendants to gain acceptance of Plaintiff's Rights based not on the miniseries, but on the reputation, hard work and goodwill of Plaintiff.

84.     Defendants have unfairly profited from their false and/or misleading representations.

85.     Plaintiff has been damaged by Defendants' false and/or misleading representations.

86.     Defendants' acts are willful and Plaintiff is entitled to treble damages.

87.     The unlawful acts of Defendants complained herein constitute a false designation of origin, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

### COUNT THREE
*Negligence*
**(Against All Defendants)**

88.     Plaintiff repeats, re-alleges, adopts and incorporates all of the previous allegations of the entirety of this Verified Complaint, with the same force and effect, as if fully set forth herein again at length.

89.     At all times, and pursuant to applicable law, Defendants owed a duty to Plaintiff not to use Plaintiff's Rights in advertisements or otherwise to associate with, advertise, promote, market or sell Defendants' products and services.

90.    Defendants breached that duty by using Plaintiff's Rights in the advertisements and otherwise to associate with, advertise, promote, market or sell Defendants' products and services.

91.    As an actual and proximate result of the aforesaid wrongful acts of Defendants, Plaintiff has been damaged in an amount that is not yet fully ascertainable, but which exceeds the jurisdictional minimum of this Court.

92.    As an actual and proximate result of the aforesaid wrongful acts of Defendants, Plaintiff has suffered severe emotional distress and harm in an amount to be determined at trial by a jury.

93.    As an actual and proximate result of the aforesaid wrongful acts of Defendants, Plaintiff has suffered severe harm to her reputation in an amount to be determined at trial by a jury.

94.    As an actual and proximate result of the aforesaid wrongful acts of Defendants, Defendants have received and will receive large profits from and attributable to the unauthorized use, which Plaintiff is entitled to recover.

95.    Plaintiff also seeks preliminary and permanent injunctions to prohibit Defendants for any further commercial use of Plaintiff's Rights.

### COUNT THREE
***Unjust Enrichment***
**(Against All Defendants)**

96.    Plaintiff repeats, re-alleges, adopts and incorporates all of the previous allegations of the entirety of this Verified Complaint, with the same force and effect, as if fully set forth herein again at length.

97.     By their wrongful acts and omissions, each and every Defendant was unjustly enriched at the expense of and to the material detriment of Plaintiff Luhn.

98.     Defendants were unjustly enriched as a result of the compensation and financial and other benefits they received while unjustly enriching themselves to the detriment of Plaintiff.

99.     Defendants' actions have caused, and will continue to cause, irreparable harm to Plaintiff, and will continue to so harm Plaintiff unless preliminarily and permanently enjoined.

100.    Furthermore, Defendants are realizing profit and will continue to realize profits from its unlawful actions. Defendants' unlawful actions are causing and will cause Plaintiff monetary damage in amounts to be determined at trial.

101.    Plaintiff seeks restitution from Defendants, each and every one of them, and seeks an order disgorging all profits, benefits, and other compensation obtained from their wrongful conduct.

## VII.  PRAYER FOR RELIEF

(a) For general (non-economic), special (economic), actual and compensatory damages in excess of $250,000,000 USD;

(b) for additional consequential damages in a sum reasonable to a jury;

(c) for punitive damages in excess of $500,000,000 USD to punish and impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(d) for Defendants to immediately produce to Plaintiff Luhn the script and any already produced video and audio for the eight-part miniseries and for preliminary and permanent injunctive relief to air this eight-part miniseries and to use Plaintiff's likeness, being and life story in any way without it being accurate and non-defamatory, as well as her being fairly compensated for its use;

(e) for attorneys' fees, expenses and costs of this action, and;

(f)  for such further relief as this Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Luhn demands a trial by jury on all counts as to all issues so triable.

## SIGNATURE AND VERIFICATION

I, Laura Luhn, hereby swear under oath and penalty of perjury that the facts contained in this Complaint are true and correct to the best of my personal knowledge and belief.

**Dated**: April 1, 2019

Respectfully Submitted,

*Laura Willis Luhn*
Plaintiff Pro Se

*Of Counsel*
Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
2020 Pennsylvania Ave. NW # 800
Washington, D.C. 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com